Frederic Leake v. Commissioner.
Leake v. Commissioner
Docket No. 105723.
United States Tax Court
1943 Tax Ct. Memo LEXIS 443; 1 T.C.M. (CCH) 623; T.C.M. (RIA) 43089; February 17, 1943
*443 Fyke Farmer, Esq., for the petitioner. F. M. Thompson, Esq., for the respondent. KERN Memorandum Findings of Fact and Opinion This case comes before us on respondent's determination of a deficiency in petitioner's income tax for the year 1937 of $16,534.58. The issue is whether petitioner realized gain from the sale in the taxable year of stock which had been acquired by himself and two others in fixed proportions for the purpose of resale, but only part of which was determined to have been sold, the balance being distributed to the three adventurers. The petitioner contended that he was to receive specific shares which were set aside for him from the beginning, that no stock owned by him had been sold, and, therefore, no income had been realized. Petitioner filed his return for the taxable year with the collector for the district of Tennessee. The facts are as follows: Findings of Fact On January 21, 1937, the petitioner, Frederic Leake, who held an option to buy 103,194 1/2 shares of stock of the Tennessee Products Corporation from the Wrigley Estate of Chicago at $2.00 a share, entered into a contract with Paul M. Davis, Nashville, Tennessee, hereafter called "Gray," providing *444 for the acquisition and sale of this number of shares of that stock. Under the terms of the contract, Davis and Gray agreed to advance a sufficient amount of money to pay for the stock in full. Upon receipt of the stock 3,194 1/2 shares were to be delivered to the petitioner free and clear of any claim by Davis and Gray. The remaining 100,000 shares were to be delivered to Gray for sale at the best price obtainable but at not less than $6 a share without the consent in writing of Davis and petitioner being first obtained. Gray had the exclusive right to sell the stock at not less than $6 a share, and to sell the same clas of stock for others without accounting therefor to its co-contractors. The proceeds from the sale of the stock were to be used first to repay the amount of money advanced by Davis and Gray with interest thereon, and thereafter to be divided 40 percent to petitioner, 30 percent to Davis and 30 percent to Gray. The agreement was to last until the 100,000 shares of stock were sold but in no event longer than six months, unless extended by unanimous consent of the three contracting parties. Upon termination of the agreement, if any of the stock remained unsold and the *445 amount advanced by Gray and Davis had not been repaid in full, the remaining stock was to be divided 40 percent to petitioner, 30 percent to Gray and 30 percent to Davis, and each was to contribute the same proportion of the amount remaining due from the advancement by Davis and Gray, so that the entire advancement should be paid in full. If the advancement were already paid in full, at the time of distribution, the unsold stock was to be divided in the above proportions without any other payments. Paragraphs 2, 5, 7 and 9 of the contract, the substance of which has been given, were in exact language as follows: 2: The said Davis and Gray agree to advance a sufficient amount of money to pay for said stock in full, including cost of transportation and expenses, if any, of issuing same. * * * * *
5: Gray shall have the exclusive right to sell said shares of stock from time to time at such price not less than $6.00 per share, and in such manner as it may deem desirable and for the best interests of the subscribers to this agreement. The said Gray shall likewise have the right to buy and sell stock on the open market and execute orders for the buying and selling of stock for others, *446 or in its own name, without dealing with the shares of stock herein mentioned in its discretion, and without accounting for such sales not affecting the stock deposited with it as herein mentioned. During the pendency of this agreement the said Davis and Leake shall not buy, sell or deal in common stock of Tennessee Products Corporation except through Gray, or with its consent. * * * * *
7: The proceeds arising from the sale of said stock shall be used first to repay the amount of money advanced by Davis and Gray, together with interest thereon from the date of advancement, at the rate of 6% per annum until such amount has been paid in full, and thereafter shall be divided 40% to Leake, 30% to Davis, and 30% to Shillinglaw. * * * * *
9: At the termination of this agreement if all of the shares of stock are sold, division shall be made as hereinabove provided. In the event any shares of stock are remaining and the entire amount advanced by Davis and Gray has not been repaid in full, the remaining stock shall be divided 40% to Leake, 30% to Davis and 30% to Gray, and each of them shall contribute the same proportion of the amount remaining due from the advancement made by Davis *447 and Gray, together with interest thereon, so that the entire advancement made by them shall be paid in full. If such advancement has been paid in full on the date of the termination of this agreement any unsold stock shall be divided in the above proportions, without any further or other payments, but settlement shall be made at the same date of any balance in the hands of said Gray. It was never contemplated under the contract than anyone should engage in the selling of the stock other than Gray. The stock was shipped by the Wrigley Estate to the Federal Reserve Bank of Nashville with a draft attached for $206,389, on or about February 2, 1937. Gray paid the purchase price of the stock and the stock was held by it to be sold. On February 2, 1937, a transfer and reissue of the stock (103,194 1/2 shares) was made by the transfer agent for the Tennessee Products Corporation, 3,194 1/2 shares being reissued in the name of the petitioner and 100,000 shares in the name of Rockdale and Co. which was Gray's nominee. Shortly after the expiration of the six-months period provided by the contract, petitioner demanded of Gray an accounting and settlement. He received 26,240 shares of Tennessee *448 Products Corporation stock as well as certain sale slips or memoranda showing the purchase by Gray for his account, on February 2, 1937, of 43, 194.5 shares of Tennessee Products stock at $1,9111 the share, or a total of $82,560, and the sale, for his account, of 13,760 shares on the same date at $6 a share, or a total of $82,560. A third memorandum was given him showing the sale for his account, as agent of the Tennessee Products Corporation, of 103,194 1/2 shares of Tennessee Products Corporation common at $2 a share, or for a total of $206,389. Petitioner's attorney advised Gray that he did not understand their explanation of the transactions in the Tennessee Produces stock under the terms of the agreement and that petitioner was not to be considered as bound by the transaction puported to have been shown by the memoranda and slips referred to; and also, that no further agreement could be made until a proper detailed accounting had been furnished. In response thereto, a statement of petitioner's account in connection with the transactions was furnished by Gray to him as follows: STATEMENT OF ACCOUNT
TENNESSEE PRODUCTS
STOCK
Account started with 100,000 shares
at
$206,389.00
To liquidate debt at $6
per share
34,398 shs.
206,389.00
Leaving on hand
65,602 shs.
Of this 65,602 shares, Mr.
Leake to receive 40%
or
26,240 shs.
Mr. Davis and associates
to receive 60% or
39,362 shs.
65,602 shs. On February 2, 1937, Mr. Davis and associates added 7500 shares to the above 34,398 shares, making a total of 41,898 shares which were sold through Gray, Shillinglaw & Company at an average net price of $4.93 per share, producing $206,389.00 necessary to pay off indebtedness. This sale may be verified through Gray, Shillinglaw's ledger sheets, which are subject to your inspection if necessary. At the time of the trial of this case on March 26, 1942, petitioner had a suit pending in the state court, in which he was endeavoring to obtain an accounting from Gray under the contract of January 21, 1937. The records of Gray, Shillinglaw & Co. show the purchase of 103,194.5 shares of stock of Tennessee Products Corporation on February 2, 1937 and the sale of 83,194.5 shares of the same stock on that day. The records showing such purchases and sales disclose erasures which were made by the employee of Gray charged with the duty of keeping these records. These erasures were made in order to have the stock certificate numbers run consecutively on the books of record, and so for convenience in keeping the records. Petitioner personally made no sales of any part of the 100,000 shares of stock which were to be sold under the terms of the agreement of January 21, 1937. In the sales of the Tennessee Products stock by Gray, indicated by Gray's records, no attempt was made to ear-mark any specific certificate numbers as applicable to any specific sale and in no instance was any attempt made to allocate any particular sale of stock by certificate number to any particular name or number. In the ordinary course of business of a brokerage firm, the usual procedure in handling stock certificates is to handle those shares which are most convenient and the number on a certificate of stock, therefore, has no particular significance as pertaining to any particular transaction. Gray treated as sold in 1937 a sufficient number of shares to pay the purchase price of the stock, $206,389; and this amount included the agreed proportion of shares said by Gray to have been sold on petitioner's account, which were duly credited to petitioner's account with Gray at the agreed minimum price of $6 a share, or $82,560. Petitioner did not include any of the proceeds or credits from the disposition of these shares in his income tax return for the taxable year. The Commissioner determined that petitioner "realized a profit of $56,259.82 from the sale of 13,760 shares of common stock of the Tennessee Products Corporation on February 2, 1937." This amount was evidently arrived at by subtracting from $82,560 the cost basis of the stock to petitioner, or the sum of $26,300.18 (13,760 X $1.911 plus an unexplained item of $3.44 which we may surmise represented commissions). From the 26,240 shares of Tennessee Products Corporation stock received by the petitioner from Gray, petitioner sold 800 shares during the taxable year. In his tax return petitioner treated this stock as having a basis to him of zero. Opinion KERN, Judge: Although the facts are somewhat confused, we think that the question and its answer emerge sufficiently clearly to make a long discussion unnecessary. To state the situation briefly, petitioner had an option for the purchase of 103,194 1/2 shares of Tennessee Products Corporation common stock at $2 a share, on reorganization of that corporation. He made a contract on January 21, 1937 with Davis and a stock brokers' firm which we shall call "Gray," by which Davis and Gray should advance the necessary cash to buy this stock, transfer immediately to himself, the petitioner, 3,194 1/2 shares, sell the rest at not less than $6.00 a share, and at the end of 6 months turn over to him 40 percent of the proceeds of the 100,000 shares not needed to reimburse Gray and Davis, or distribute the same proportion of shares to him. Gray purported to sell 13,760 shares for the petitioner on February 2, 1937, and certainly did credit him with $82,560 for these shares as sold at $6 a share, and did transfer to him free of liens 26,240 shares of the unsold stock which was his proportion of the stock said by Gray to be unsold. These are enough facts to make it possible to state the question in issue. Respondent assumed that the stock reported as sold by Gray for petitioner was sold and calculated a gain accordingly of $56,259.82, determined by subtracting from the credited $82,560 the cost of the 13,760 shares at $1.9111 the share. It will be observed that the cost of 103,194 1/2 shares at $2 a share is $206,389. Gray, as exclusive broker under the contract, for not only is the exclusive agency clear but it is also clear on the testimony that petitioner sold no shares on his own account, purported to sell under the contract 34,398 shares, of which petitioner's 13,760 shares supposedly sold constituted 40 percent, and it will be seen that this amount, at the sale price of $6 agreed on the contract, realizes the $206,388 necessary to pay the purchase price. It appears that what Gray did was to add 7,500 shares of the same stock procured from another source and to sell altogether 41,898 shares, at an average price of $4.93 a share, but it credited to petitioner the sales of his proportion (13,760 shares) at $6 a share as agreed, or $82,560. It is now apparent where the controversy lies. Respondent is contending that petitioner owned 40 percent of the 100,000 shares, and that 13,760 of those were sold for $82,560; with a resultant gain. As to the 3,194 1/2 shares received on February 2, 1937, and the 26,240 shares distributed 6 months later when the contract terminated, their cost basis will be $1.9111 the share which is the same as those sold. Petitioner contends, however, that none of his shares was sold, what was sold being merely those temporarily held by the broker, Gray, for that purpose only and which were intended to reimburse Gray for the latter's advances. This theory, it is obvious, would put the cost basis of the two lots received by petitioner at zero, but it would result in no present realization of income. And it is present realization which is now in issue. The essence of petitioner's contention is that there was no sale of petitioner's shares. The evidence on this point is not as clear as it might be, but it is clear that petitioner's shares, (and we are assuming now that he had an interest in the whole number of shares, a point which we shall consider more fully later), whether they were sold by Gray to another or to itself, were treated by Gray as if sold for petitioner's account and his account was fully credited at the agreed price of $6 a share. This is a most significant fact. The entries on the ledgers of Gray had been erased by the bookkeeper and rearranged in the order of the share certificate numbers, and petitioner makes much of this fact. Petitioner had demanded and had submitted to him a statement by Gray showing the sales, but petitioner insists that the only sales of the stock actually made were 15,000 shares to one Compagnoli and that these shares sold had been allotted to Davis and not to petitioner. A witness from the brokerage firm testified that no identification by certificate numbers was ever made by the firm. But even if we assume in petitioner's favor that Gray did not sell the shares to outsiders, its credit to petitioner for shares allegedly sold and its consequent distribution to him, free of cost, of the 26,000 odd sa remaining in July 1937 makes obvious the fact that petitioner's received shares were paid for in some manner; and that being so, we think it irrelevant to inquire further as to whether the shares were purchased by Gray or were sold by Gray to others. The 13,760 shares no longer belonged to petitioner and in return therefor he was credited by Gray with $6 a share, or $82,560. Petitioner may have thought that the shares sold by Gray were sold at a higher figure than that credited, or if they were purchased by Gray, were later sold to others at a higher figure, for he accepted the 26,000 shares distribution without prejudice and brought a suit for an accounting against Gray in the local courts, but this fact, if it shows anything, shows that petitioner did not disaffirm or seek to avoid the action of Gray in disposing of the 13,760 shares either to itself or to others. That brings us to the question: what were the relations of the parties? The contract provided that Davis and Gray should "advance a sufficient amount of money to pay for said stock in full." The proceeds "shall be used first to repay the amount of money advanced by Davis and Gray." These provisions, petitioner contends, made his obligation under the contract contingent. But section 9 expressly provided that if "the entire amount advanced by Davis and Gray has not been repaid in full, the remaining stock shall be divided * * * and each of them shall contribute the same proportion of the amount remaining due from the advancement made by Davis and Gray." There would seem to be no doubt that petitioner was a co-adventurer in the scheme, and that he had a definite and fixed obligation to buy and pay for his share of the stock. The advances by Davis and Gray were nothing more than a convenience which saved petitioner from a down-payment, or from any payment at all if the stock should be sold quickly enough. But this arrangement did not touch the common obligation of the three adventurers. In the light of this conclusion, we think that petitioner bought 3,194 1/2 shares and 40 percent of the 100,000 shares remaining; or 43,194 1/2 shares in all; and that having disposed of a portion of the latter, or 13,760 shares, through his co-adventurer, and agent for that purpose, Gray, he is taxable presently on any gain realized thereby. Since he was credited by Gray with $6 a share on those shares sold, or $82,560, his cost for the total 43,194 1/2 shares was $1,9111 a share, the figure at which the respondent has computed it. It may be that petitioner realized through Gray a better sale price than $6 a share and that this fact will appear hereafter in the suit for an accounting, but since so much gain is now acknowledged on the broker's books, and in its dealings with petitioner, we can not now charge him with less gain than his rights under the contract and the acknowledgment of the other interested parties entitled him to. Some slight adjustment for selling expense occurs and has been allowed for in respondent's determination. The remaining objections of petitioner may be summarily disposed of. There is no evidence whatever that the certificates of stock sold were earmarked by the broker, but there is direct testimony to the contrary. The fact that petitioner did not sell the stock personally is of no moment, since his agent's acts are his own, and Gray was the agent contemplated under the contract to do all selling of the Tennessee Products stock. To treat, as petitioner contends, the 29,434 1/2 shares received in hand by petitioner as having no cost to him would require us not only to disregard the plain meaning of the contract but to suppose that the two other parties to it had a donative intent, a supposition which would insult common sense where business men are dealing with each other at arm's length in trade. Judgment will be entered for the respondent. *449